DIMOPOULOU, Plaintiff,

v.

FIRST UNUM LIFE INSURANCE COMPANY, Defendant.

1:13–cv–7159

United States District Court, S.D. New York.

Signed January 25, 2016

Filed January 26, 2016

---

Andrew Scott Davis, Michael Steven Hiller, Weiss & Hiller, PC, New York, NY, for Plaintiff.

Louis Philip Digiaimo, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Newark, NJ, for Defendant.

### MEMORANDUM & ORDER

ANDREW L. CARTER, JR., United States District Judge:

Defendant First Unum Life Insurance Company ("Unum") denied plaintiff's claim for long-term disability benefits. She then sued under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, asking for a declaration that she is entitled to disability coverage and back payments from the date of her claim. Both parties now move for summary judgment. For the reasons set forth below, both parties' motions are denied and the claim is remanded for further administrative review.

## I. BACKGROUND

### A. Statement of facts

#### i. Plaintiff's long-term disability policy

Plaintiff is a policyholder in a long-term disability insurance plan issued by Unum to her employer, Blackstone Administrative Services Partnership, L.P. ("Blackstone"). Rule 56.1 Stmt ¶¶ 3–4, 301. The policy grants Unum discretionary authority to interpret its terms and provisions when determining eligibility for benefits. *Id.* at ¶ 301.

#### ii. Policy definition of disability

The policy defines "disability," in relevant part, as occurring when "Unum determines that: You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury...." *Id.* at ¶ 302. "Material and substantial duties" are those that "are normally required for the performance of your regular occupation." *Id.* A "regular occupation" is "the occupation you are routinely performing when your dis-

ability begins ... [and] as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.*

#### iii. Plaintiff's disability claims before Unum

##### 1. July 27, 2010 grant of February 2010 Claim

In February 2010, plaintiff took a leave of absence from Blackstone. *Id.* at ¶ 64. On February 17, 2010, she filed a Notice and Proof of Claim for Disability Benefits ("February 2010 Claim"), requesting long-term disability benefits from the date of February 1, 2010. *Id.* at ¶¶ 303–04.

In June 2010, plaintiff returned to work part-time. *Id.* at ¶ 93. On July 27, 2010, Unum informed plaintiff by letter that it had granted her February 2010 Claim for long-term disability benefits up to the day that she returned to work in June 2010. *Id.* at ¶¶ 331, 335–36. Unum's reasoning for the grant was terse. The letter states only that the decision was based on "a combination of your physical and psychiatric conditions." Administrative Record ("AR") at 356. No specific condition is identified. The letter also noted that plaintiff's acupuncturist "has indicated that your pain and fatigue are worse when you feel stressed and better after a visit with your therapist. With that in mind, the Mental and Nervous Limitation in your employer's policy may apply to this and any future claims." *Id.*

##### 2. July 21, 2011 denial of November 2010 Claim

On December 7, 2010 a Blackstone representative informed Unum that plaintiff had stopped working again due to her disability. Rule 56.1 Stmt. at ¶ 338. On December 13, 2010, plaintiff's physician, Dr. Ward Carpenter, wrote to Unum in support of plaintiff's renewed claim for

long-term disability benefits beginning November 30, 2010 ("November 2010 Claim"). *Id.* at ¶ 149. Dr. Carpenter's letter stated that he had diagnosed plaintiff with chronic fatigue syndrome ("CFS") and fibromyalgia. AR at 411.

On July 21, 2011, Unum informed plaintiff by letter that it had denied her November 2010 Claim for benefits. Rule 56.1 Stmt. ¶ 413. The July 21 letter states that payment for plaintiff's February 2010 Claim had been "made utilizing the policy's Mental Illness Limitation." AR at 762. In a section titled "Information That Supports Our Decision," the letter discusses evidence as to whether the plaintiff suffers from four ailments: depression, bipolar disorder, CFS, and fibromyalgia. *Id.* at 762–64. In favor of a finding of depression, the letter notes that plaintiff began taking an antidepressant in July 2009, switched to a different antidepressant in November 2010, and upped her dosage on the same antidepressant in December 2010. *Id.* 762–63. In favor of a finding of bipolar disorder, the letter notes that plaintiff's psychiatrist submitted a psychiatric assessment form to Unum in June 2010 that supported that her bipolar disorder was impairing, given her trouble with focusing and concentration. *Id.* at 762. It also cites evidence of plaintiff's change in mood and increasing fatigue. *Id.* at 763.

Against a finding of CFS, the letter states that plaintiff's "signs and symptoms do not meet the CDC [Center for Disease Control and Prevention] diagnostic criteria for" CFS. *Id.* The letter lists those criteria as "(1) clinically evaluated and unexplained persistent or relapsing chronic fatigue that is new onset, is not a result of ongoing exertion, is not substantially alleviated by rest[,] and results in substantial reduction in previous levels of occupational, educational, social[,] or personal activities" and "(2) the concurrent occurrence of four or more [of] the following symptoms: Sub-

stantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern[,] or severity; unrefreshing sleep and post[-]exertional malaise lasting more than 24 hours." *Id.* The letter notes that CFS is a diagnosis of exclusion, meaning the patient's symptoms are not explainable by diagnoses of other physical or psychological ailments. *Id.*

According to the letter, plaintiff failed to meet either of the CFS diagnostic criteria. She failed to meet the first prong because her "fatigue symptoms were clinically evaluated with testing without a medically reasonable explanation of fatigue beyond Depression." *Id.* That conclusion is supported by unspecified reports of her psychiatrist from February through June 2010 and plaintiff's prior diagnosis of bipolar disorder. *Id.* Plaintiff failed to meet the second diagnostic prong of CFS because there were no signs that she suffered from tender lymph nodes, a change in headache pattern (beyond an isolated bout of sinusitis), or post-exertional malaise lasting more than 24 hours. *Id.* On that final point, the letter cites a notation from a visit with a physician on December 6, 2010 that stated that plaintiff recently felt better after a two-mile run. *Id.* The letter does note, however, plaintiff's proof of a sore throat on one occasion and muscle and joint pain. *Id.*

The letter also lays out diagnostic criteria for fibromyalgia as set by the American College of Rheumatology: "a widespread pain index of greater than 7, symptoms present for [at] least 3 months, and not having a disorder that otherwise would explain the pain." *Id.* at 764. After briefly discussing plaintiff's symptoms that are congruent with a diagnosis of fibromyalgia, the letter states that those same symptoms overlap with a diagnosis of depression. *Id.*

The letter further notes that a fibromyalgia diagnosis does not result in physical damage to the affected muscles and that plaintiff's body shows no signs of physical damage. *Id.*

In the following paragraph the letter states that "[t]here is no contraindication for individuals with Fibromyalgia to continue to work[,] especially in a sedentary work capacity .... Studies published in the medical literature reveal that the majority of patients with Fibromyalgia are able to work full time in their usual occupation." *Id.*

The letter also notes that correspondence with plaintiff's psychiatrist on April 14, 2011 confirmed that plaintiff's bipolar disorder was in full remission. *Id.* A June 30, 2011 telephone call with plaintiff's psychiatrist confirmed that he had not seen plaintiff since December 2010 and that he deferred opinion on her impairment to her physical care providers. *Id.* at 765.

The letter closes its reasoning for denying plaintiff's disability claim by stating that "review of the file did not support restrictions or limitations of any kind from any condition as of the new proposed date of disability of November 30, 2010...." *Id.*

### 3. August 11, 2011 renewed denial of November 2010 Claim

Plaintiff submitted additional information in support of her November 2010 claim after it was initially denied. Rule 56.1 Stmt. at ¶ 436. That information included a letter from Dr. Carpenter and an office visit note from April 19, 2011. AR at 798. On August 11, 2011, Unum informed plaintiff by letter that the additional information did not change its prior decision denying the claim. *Id.* at 797–98.

The August 11, 2011 letter states that the new information was reviewed by a board certified physician and that it did "not support any restrictions or limitations related to fibromyalgia or chronic fatigue

syndrome, nor [did it] support these diagnoses at all." *Id.* at 798. Further, plaintiff's "full medical picture, which includes reported diagnoses of bipolar disorder, hypothyroidism[,] and vitamin D deficiency ... does not demonstrate a reduction in capacity sufficient to preclude full[-]time work in a sedentary occupation...." *Id.*

A second review of the information by another physician led "to the same conclusion...." *Id.* The second reviewing physician reasoned that because plaintiff did not appear to have confirmed diagnoses of fibromyalgia or CFS, and because there were no new diagnostic test results or physical findings to report such, the reviewing physician's opinion on plaintiff's disability remained unchanged. *Id.*

### 4. July 5, 2012 denial of the appeal of the November 2010 Claim

On May 23, 2012, plaintiff appealed the decision on the November 2010 Claim before Unum. Rule 56.1 Stmt. at ¶ 437. On July 5, 2012 Unum informed plaintiff by letter that it had denied her appeal. *Id.* at ¶ 463.

In a section titled "Information that Supports Our Decision," the July 5, 2012 letter characterizes the July 21, 2011 letter denying the November 10 Claim as "outlin[ing] Unum's] analysis that the medical data does not support restrictions and/or limitations as of November 30, 2010...." *Id.* at 1208.

On appeal before Unum, plaintiff had argued that her exhaustion, muscle pain, and fatigue impaired her ability to function and concentrate. *Id.* at 1209. Further, her condition had deteriorated since she left work in November 2010. *Id.* In support of these arguments, plaintiff had submitted affidavits from herself, her husband, and a co-worker, attesting to the severity of her symptoms. *Id.* She also submitted a letter of support from Dr. Carpenter and a letter of support from

mental health practitioner Dr. Serena Deutsch, dated April 2012. *Id.*; *id.* at 935–939. Dr. Deutsch's letter stated that plaintiff did not demonstrate signs of clinical depression or bipolar disorder. *Id.* at 937. The July 5, 2012 denial letter from Unum notes that Dr. Deutsch did not begin to treat plaintiff until December 2011, a year after her November 2010 Claim was filed, while plaintiff must be determined to be disabled from November 2010, forward. *Id.*

The letter further notes that on January 25, 2011, Dr. Carpenter described plaintiff as possessing "functional capacity consistent with sedentary activity." *Id.* The January 25, 2011 statement attributed to Dr. Carpenter is from a form entitled "Disability Status Update." *Id.* at 466–67. Under the headline "Functional Capacity," the form directs an attending physician to check a series of boxes in order to convey the physician's knowledge of the patient's current functional capacity. *Id.* at 466. The boxes are divided into four columns, with the following titles: Never: 0%, Occasionally: 1–33%, Frequently: 34–66%, and Continuously, 67–100%. *Id.* Dr. Carpenter indicated that plaintiff could "continuously" sit, stand, and perform fine finger movements and hand/eye coordinated movements in both hands. *Id.* She could "frequently" lift up to ten pounds and reach above shoulder level. *Id.* She could "occasionally" walk. *Id.* On the same form, Dr. Carpenter wrote that plaintiff "cannot participate in any daily employment." *Id.* at 467.

The July 5, 2012 letter also states that "there is no laboratory evidence in the file to support any type of immunodeficiency syndrome." *Id.* at 1209. It reiterates the CDC criteria that Unum used to assess plaintiff's claim of CFS and sets out some of the evidence that disputed constant fatigue, including plaintiff's return to work in June 2010, her self-reported "slight im-

provement" in symptoms that same month, the two-mile run she took in November 2010, and daily exercise since in the period between the November run and a December 6, 2010 visit with Dr. Carpenter. *Id.* at 1209–10. It then relates that the physician who reviewed plaintiff's appeal "said that the medical evidence does not support . . . a definitive 6–month continuous period of severe fatigue (not due to overexertion) prior to November 30, 2010" and that plaintiff therefore did not meet the primary diagnosis criteria for CFS. *Id.* Plaintiff failed to meet the secondary criteria for CFS because "[w]hile she reported a variety of additional symptoms between February and June 2010, there is no medical evidence that she reported at least 4 of the 8 additional CFS symptoms persistently for a continuous 6–month period prior to November 30, 2010." *Id.* The fibromyalgia diagnosis was similarly unsupported in that "[t]here is no evidence that [plaintiff] met fibromyalgia criteria for a continuous 3–month period prior to November 30, 2010." Instead, the letter stated, "the medical evidence supports that [plaintiff] had depressive symptoms and was undergoing active treatment with a psychiatrist around November 30, 2010 when she stopped working." *Id.* at 1211.

The letter makes clear that Unum "recognize[s] the distinction between the amount of pain and fatigue that an individual experiences, which is subjective, and how much an individual's pain and/or fatigue limits their functional capacity, which can be measured." *Id.* It considers "reasonable that [Unum] require medical proof of the extent of impairment of function beyond the self[-]reports of an insured and their doctor's endorsement of those complaints without quantifying their functional limitations." *Id.* The letter ends by summarizing Unum's view of plaintiff's claim as lacking a "unifying diagnosis to account for your client's fatigue and pain. There is

a lack of physical examination findings to support ongoing pain at an impairing level. There are multiple historical inconsistencies regarding her reported fatigue symptoms." *Id.*

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  There is no issue of material fact where the facts are irrelevant to the disposition of the matter.  Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.  *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.,* 696 F.Supp. 897, 900 (S.D.N.Y.1988).  To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  On cross-motions for summary judgment, the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the non-moving party.  *Sciascia v. Rochdale Village, Inc.,* 851 F.Supp.2d 460 (E.D.N.Y.2012) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)).

### B.  Arbitrary and Capricious Standard under ERISA

■ When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits challenged under ERISA.  *Firestone Tire & Rubber Co. v.*

*Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).  The court may reverse only if the fiduciary's decision was arbitrary and capricious, that is, "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Zervos v. Verizon New York, Inc.,* 277 F.3d 635, 646 (2d Cir.2002).

■ Under the arbitrary and capricious standard, "[w]here both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control." *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Ben. Plan,* 698 F.2d 593, 601 (2d Cir.1983).  However, "deferential review is not no review, and deference need not be abject."  *Zurndorfer v. Unum Life Ins. Co. of America,* 543 F.Supp.2d 242, 258 (S.D.N.Y.2008) (citing *Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir.2001) (internal quotations omitted)).

■ "Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Pepe v. Newspaper & Mail Deliverers'–Publishers' Pension Fund,* 559 F.3d 140, 147 (2d Cir.2009).  At the very least, a decision to deny benefits must be "based on a consideration of the relevant factors."  *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks omitted). Additionally, "denial of an appeal that is based on insufficient notice as to how the claim might be perfected fails to meet the requirements of ERISA and its implementing regulations, and is therefore unreasonable as a matter of law."  *Cook v.*

*New York Times Co. Long–Term Disability Plan,* 2004 WL 203111, at *11 (S.D.N.Y. Jan. 30, 2004).

The parties do not dispute that plaintiff's policy grants Unum discretionary authority over determination of her eligibility for benefits and over interpretation of the terms and provisions of the policy. Plaintiff does argue, however, that Unum's conflict of interest as both eligibility evaluator and benefits payer merits "dialed back" deference. *Miles v. Principal Life Ins. Co.,* 720 F.3d 472, 485 (2d Cir.2013) (stating that "courts may dial back deference if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest") *Miles v. Principal Life Ins. Co.,* 720 F.3d 472, 485 (2d Cir.2013) (internal quotations omitted). The Court need not take up this argument, because Unum's decision to deny benefits in this case, even when viewed with full deference, was arbitrary and capricious. Below, the Court explains why it reaches this conclusion.

### C. Analysis

A close reading of the denial letters and of the administrative record itself leads to the conclusion that Unum's decision to deny benefits was inconsistent with the plain words of the plan and arbitrarily ignored relevant evidence. Further, Unum gave plaintiff insufficient notice as to the standard by which it was assessing her claim and thus how her claim might be perfected. Accordingly, Unum's decision to deny plaintiff's long-term disability benefits was arbitrary and capricious.

**i. Unum's focus on whether plaintiff's symptoms satisfied diagnostic criteria rather than whether they limited her occupational performance was arbitrary and capricious.**

▮ Unum's stated rationale for denying plaintiff's disability claims, across multiple letters, focused on her inability to meet diagnostic criteria for the specific illnesses of CFS and fibromyalgia. That narrow focus contradicts the plan's plain language, which defines a disability as occurring whenever "[y]ou are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury . . . ." *Id.* at ¶ 302. The plan thus defines "disability" not in terms of satisfaction of specific diagnostic criteria, but rather in terms of the performance limits one faces in her occupation due to any sickness or injury. It is arbitrary and capricious to deny a plaintiff's disability claim because she cannot prove that she suffers from a specific illness, as opposed to performance limiting symptoms of an unidentified illness.

Unum argues that it did not require plaintiff to meet diagnostic criteria of CFS or fibromyalgia, but only considered their absence as one of many factors in the disability analysis. The administrative record contradictions this assertion. The July 21, 2011 denial letter contains no analysis whatsoever of whether plaintiff's symptoms are performance limiting. Instead, after discussing why plaintiff fails to meet objective diagnostic criteria for CFS or fibromyalgia, it states in a conclusory fashion that "review of the file did not support restrictions or limitations of any kind from any conditions. . . ." AR at 765. Additionally, that same denial letter states Unum's opinion that "[t]here is no contraindication for individuals with Fibromyalgia to continue to work[,] especially in a sedentary work capacity. . . ." *Id.* The letter thus categorically denies disability benefits to sufferers of fibromyalgia performing sedentary work, even when they satisfy diagnostic criteria, and regardless of their actual symptoms.

The August 11, 2011 denial letter repeats the same conclusory analysis, stating only that the information in plaintiff's file

does "not support any restrictions or limitations *related to fibromyalgia or chronic fatigue syndrome, nor to support these diagnoses at all.*" *Id.* at 798 (emphasis added). The August 11 letter's linkage of restrictions and limitations to diagnoses of specific illnesses is further evidence that Unum improperly focused on plaintiff's diagnosis rather than her symptoms.

The July 5, 2012 appeal letter contains Unum's first attempt at an analysis of whether plaintiff's actual symptoms rose to a disability under the plan. It cites to a description by Dr. Carpenter of "functional capacity consistent with sedentary activity, which is performed primarily from a seated position with brief periods of standing and walking . . . ." *Id.* at 1209. That description refers to Dr. Carpenter's check marks on the Disability Status Update form, which in fact indicated that plaintiff was capable of walking as little as 1% of the time and at most only 33% of the time. *Id.* at 466. But the July 5, 2012 letter fails to reconcile Dr. Carpenter's statement on the next page of the form that plaintiff "cannot participate in daily employment." *Id.* at 467.

In its briefing, the sole analysis of functional capacity that Unum points to in the administrative record came from a physician who reviewed the file on appeal. *Id.* at 1197–1200. That physician stated that "[t]he medical evidence does not support that the reported symptoms of the [employee] or the opined diagnoses offered by her [attending physician] were consistent with impairment to preclude her from performing the physical demands of her occupation as of 11/30/10." *Id.* at 1197. The appeals physician's rationale for that conclusion depends on a lack of "laboratory evidence in the file to support any type of immunodeficiency syndrome," *id.* at 1198; plaintiff's failure to demonstrate "a definitive 6–month continuous period of severe fatigue (not due to over exertion) prior to

11/30/10," *id.* at 1199; "no evidence that the [employee] met [fibromyalgia] criteria for a continuous 3–month period prior to 11/30/10," *id.*; and "multiple inconsistencies in the file" regarding plaintiff's fatigue symptoms during the 6–month period preceding her claim, *id.* at 1200. In other words, the appeals physician's functional capacity analysis depended entirely on plaintiff's failure to meet the diagnostic criteria for CFS and fibromyalgia. Unum's analysis of plaintiff's functional capacity thus relied only on Dr. Carpenter's check marks on a singular form. Given the conflicting evidence on the form itself, Unum's decision to rely on it alone to deny that plaintiff was disabled within the plan's meaning was impermissible.

■ In sum, it was arbitrary and capricious for Unum to fail to analyze whether plaintiff's actual symptoms, as opposed to her diagnoses, satisfied the plan's definition of a disability. To the extent that Unum's decision relied on Dr. Carpenter's check marks alone, it was unsupported by substantial evidence.

### ii. Unum arbitrarily ignored or assigned diminished weight to evidence of symptoms after November 30, 2010.

■ Although the proper focus of Unum's inquiry is plaintiff's functional capacity given her symptoms, "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating[,]" including evidence of fulfillment of medically accepted diagnostic criteria. *Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 88 (2d Cir.2009). Unum is therefore entitled to assess whether plaintiff satisfies diagnostic criteria as one factor among others when deciding whether her symptoms are disabling. It is not entitled, however, to apply a diagnostic standard that

arbitrarily ignores symptoms that do not precisely fit into such standard.

When assessing whether plaintiff fulfilled diagnostic criteria for CFS and fibromyalgia, Unum focused almost exclusively on the six-month period before the November 30 claim. It was arbitrary and capricious for Unum to exclude from consideration or afford diminished weight to evidence of plaintiff's symptoms in the six-month period after November 30 because that evidence could also have been consistent with CFS or fibromyalgia symptoms for the periods of time necessary to satisfy the diagnostic standards used by Unum.

■ When plaintiff submitted her appeal to Unum, she included a sworn statement from Dr. Deutsch that she "has not demonstrated any signs of Clinical Depression or Bipolar Disorder...." *Id.* at 1105. Unum's July 5, 2012 letter denying plaintiff's appeal took pains to note that Dr. Deutsch began treating plaintiff "as of December 2011, which is a year after the relevant timeframe of November 2010." *Id.* 1209. Though the letter leaves ambiguous how this conclusion affected the weight of Dr. Deutsch's statement, the administrative record makes clear that the physician reviewing plaintiff's claim on appeal considered "the opinion of this [attending physician] is not time-relevant regarding the [employee's] clinical/functional status on 11/30/10." *Id.* 1200. This evidence, while not dispositive as to plaintiff's mental health diagnosis at the time of her claim, directly contradicted Unum's conclusion that plaintiff's symptoms were a result of depression. It was arbitrary and capricious to exclude it from consideration, because contrary to the reviewing physician's conclusion, it is indeed relevant as to whether plaintiff suffered from CFS or fibromyalgia on the date of her claim.

■ Unum also ignored ample evidence regarding the severity of plaintiff's symptoms, including Dr. Carpenter's statement on the Disability Status Update form that plaintiff could not participate in daily employment and the sworn statements of plaintiff, her physician, and her husband. AR 997–1011; 1111–1119. The July 5, 2012 letter fails to address what weight, if any, was assigned to testimony from plaintiff's husband, but it does advance two reasons why Unum did not credit the statements of plaintiff and her doctor. First, it characterized the statements as mere "self[-]reports of an insured and their doctor's endorsement of those complaints without quantifying their functional limitations." Second, it noted "multiple historical inconsistencies regarding [plaintiff's] reported fatigue symptoms." As to the first rationale, "[p]ointing out that evidence is 'subjective' is not, by itself, a proper basis to reject evidence." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 487 (2d Cir.2013). Further, both plaintiff and Dr. Carpenter did "quantify" plaintiff's functional limitations, by stating that they prevented her from undertaking daily employment and by providing multiple reports over a period of years of plaintiff's diminished functional capacity.

As to the second rationale for discrediting plaintiff's evidence, of the inconsistencies cited by Unum all but one occurred within the six-month period preceding the November 30, 2010 claim. The sole cited piece of evidence of an inconsistency after November 30 was plaintiff's statement to Dr. Carpenter that she had exercised daily prior to December 6, 2010—a treatment that Dr. Carpenter himself had prescribed for plaintiff. AR at 1117 ¶ 4. That singular statement, addressing plaintiff's activity level only in the week after she filed the November 30 claim, stands alone against the pages of testimony of symptoms suffered by plaintiff over the course of years after her November 30 Claim. It was arbitrary and capricious to discredit evidence of those symptoms simply because it

was "subjective" or because plaintiff followed her physician's instructions in an attempt to alleviate her symptoms.

### iii. Unum applied a shifting standard as to how consistent plaintiff's symptoms must be to support disability and thus denied her notice on how to perfect her claim.

■ When Unum initially denied plaintiff's November 2010 Claim in the July 21, 2011 letter, it set forth a diagnostic standard for CFS that required (1) "persistent or relapsing chronic fatigue" and (2) "the concurrent occurrence of four or more" of specified additional symptoms. *Id.* at 763. When Unum denied plaintiff's appeal in the July 5, 2012 letter that standard had changed to (1) "a definitive 6–month *continuous* period of severe fatigue" and (2) "at least 4 of the 8 additional CFS symptoms *persistently* for a continuous 6–month period." *Id.* (emphasis added). The distinction between reoccurrence and persistence is crucial in a case such as this one, where plaintiff claims to have suffered a relapse of CFS after experiencing momentary alleviation of her symptoms. It bears mentioning, too, that in its summary judgment brief, Unum quoted a CDC standard that more closely resembles the less demanding language from the initial denial letter of July 21, 2011. Though the Court makes no finding as to which of the standards is proper, Unum is required to inform plaintiff which one it will use before it evaluates her claim and to faithfully adhere to it. Likewise, plaintiff is entitled to notice as to how that standard may be met. *See Cook v. New York Times Co. Long–Term Disability Plan,* 2004 WL 203111, at *11 (S.D.N.Y. Jan. 30, 2004) (finding arbitrary and capricious a denial of an appeal based on insufficient notice as to how the claim might be perfected) (citing *Juliano v. Health Maint. Org. of New Jersey, Inc.,* 221 F.3d 279, 287 (2d Cir. 2000)).

For all of these reasons, Unum's decision to deny plaintiff long-term disability benefits was arbitrary and capricious.

### iv. The claim is remanded for application of the proper legal standards.

■ Plaintiff cross-moves for an order directing Unum to make payment of all long-term disability benefits from November 30, 2010 to the present date, as well as an order declaring that she is entitled to continue receiving benefits under the policy. "Our precedents make clear that even where we conclude a plan administrator's finding was arbitrary and capricious, we will typically not substitute our own judgment, but rather will return the claim for reconsideration unless we 'conclude that there is no possible evidence that could support a denial of benefits.'" *Miles v. Principal Life Ins. Co.,* 720 F.3d 472, 490 (2d Cir.2013) (quoting *Miller v. United Welfare Fund,* 72 F.3d 1066, 1074 (2d Cir.1995)).

The evidence in the administrative record does not compel that conclusion here. Unum's multiple denial letters cite to evidence that plaintiff may have been suffering from mental illness that precluded awarding long-term benefits for physiological illnesses. Remand will provide Unum the opportunity to weigh this evidence under the proper legal standard. Though Unum is not required to conduct an in-person, independent medical examination of its insured, *see Hobson v. Metro. Life Ins. Co.,* 574 F.3d 75, 91 (2d Cir.2009), it may wish to do so in the special circumstances of this case, where evidence of plaintiff's allegedly disabling conditions was not amenable to diagnosis by laboratory tests and depended a great deal on both her own and others' reports of her symptoms.

At the very least, on remand Unum must provide plaintiff with adequate notice

as to the standard her claim is subject to and what evidence she may submit to meet it. To the extent that Unum continues to look to a clinical diagnosis of CFS and fibromyalgia as one factor among others in its decision, it must also consider evidence of plaintiff's disabilities from after the claim date of November 30, 2010. Finally, Unum is reminded that the proper focus of its inquiry is whether plaintiff's symptoms limited her occupational performance, regardless of whether she meets diagnostic criteria for a particular illness or whether most sufferers of one of plaintiff's alleged illness are able to engage in sedentary employment.

Plaintiff is to submit to Unum any further evidence not already on the administrative record within 20 days of communication from Unum as to the standard it will use to assess her claim and what evidence she may submit to meet it. Unum is to reconsider and render its decision within 30 days of receipt of any evidence proffered by Plaintiff. The Parties are directed to report the status of the remand 60 days and 120 days after the date of this Opinion and Order. *See Sewell v. Lincoln Life & Annuity Co. of New York,* 2013 WL 1187431, at *14 (S.D.N.Y. Mar. 22, 2013) (adopting similar procedure).

## III. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment (ECF No. 83) is DENIED. Plaintiff's Cross–Motion for Summary Judgment (ECF No. 87) is DENIED. On remand, the Parties are ordered to proceed in the manner set forth herein.

**SO ORDERED.**